My name is Benjamin Cates and I'm honored to stand before you today and present the argument on behalf of the appellant, Justin Johnson. Counsel, if you could get that mic a little closer to you. Justin Johnson. There you go. I want to start by apologizing. I'm getting over a cold, so you'll have to deal with my voice for the rest of the argument. But from the outset, I would like to state a paramount fact of this case. The attack that provides the basis of this lawsuit occurred while the inmates were in protective custody. This court has recognized that protective custody is a location designed to provide substantial supervision and security to inmates who are more likely to be assaulted. Additional facts that are vital for the court's consideration in evaluating this case include the following. In those who are minors, there's a rule at the Jefferson County Jail that requires that only one door be open at a time. Explain when you say rule, what is the evidence? There was no policy admitted below, is that correct? I mean, we don't have a written policy from the facility that says this is the rule. Correct. We have testimony from officers, is that correct? That's correct. Both of them recognized that the procedure was to close down any previously opened door, securing inmates before opening a second door. While there's no specific policy, that was the standard practice for the officers involved in this case. And so that was a rule that was in place for inmate safety. I guess what I'm struggling with, I understand what you're saying, but doesn't that sound like it's a rule violation which rings in negligence to me? And negligence is not actionable here. I think we all agree. How is this deliberate indifference when it maybe ended up in a serious situation, but it looks like it was just a violation of a policy? So while I agree and I recognize that negligence isn't the standard here, deliberate indifference is higher than that, but it's less than actual intent. But it's approaching criminal recklessness, isn't it? I mean, we've said or other courts have said, I mean, it's a long ways from negligence. Well, the court has identified that deliberate indifference is a reckless disregard for a known risk. And in this case, the known risk was that having multiple doors open at a single time exposes inmates. But isn't that just an understanding of the purpose behind the policy? I mean, most of the known risks are plaintiff dependent or situational, right? In other words, that there are other inmates who are enemies with the plaintiff or things like that. I mean, all you have here really is a policy designed for inmate safety that was breached. Well, with respect, Your Honor, I would suggest that the fact that they have actual knowledge that there's a risk of harm. But it's a concept. I mean, not everyone operating in a penal institution has knowledge that there's a risk of harm. I understand that. But the fact that this happens in protective custody as opposed to general law. Well, then every violation of a policy in a protective custody situation is actionable. And maybe not. I mean, I'm asking why is that the case under your understanding of the law here? Because what I'm suggesting is that they understand that there is the likelihood or the possibility of these attacks or a vulnerability to certain inmates. Regardless of the propensity of the attacker itself, I think when you look at it in isolation, there's an evaluation of the attackers and then there's an evaluation of the victim. So in this case, in protective custody, any violation of a rule designed for inmate safety that results in harm would be deliberately indifferent. In other words, those are just such important foundational rules for inmate safety that the deliberate indifference and negligence are closer. I would agree with that. And it's my suggestion that, and I understand that I have cited the Holden v. Herner case. And in that case, there was, in fact, an inmate who was in protective custody. But what the court determined in that case was that the plaintiff didn't present enough facts to suggest that the officers had knowledge of this reasonable risk, or excuse me, of this substantial risk, or that they took any steps to avoid it. What I'm suggesting here is that they understand that Mr. Johnson, in this case, had requested protection from a known prior threat. He was attacked earlier in the same day, so he requested protection and it was granted. They know that he needs protection, but they fail to take the reasonable steps to ensure that protection. And that's what the deliberate indifference standard is. Wouldn't that have been with relation to the known attacker, primarily? I would submit that it doesn't have to be related to the known attacker. Rather, the cases that establish the substantial risk of harm, Vandevenor and Patterson, indicate that if the victim is someone who should be better protected because of a known prior threat, they don't specify who the threat comes from and then subsequently who ultimately engages in the later attack. They don't differentiate from that. It's the fact that he had a prior threat and that the officers, in this case, knew that he had a prior threat that raises that substantial risk. Is there a way to connect the subsequent attackers with the prior assault? Is there anything in the record that connects the actual assault here that this case is based on with the attack that occurred previously? Both of these were isolated and separate. However, the fact that Mr. Johnson recognized and notified the institution of this need, and then it's granted and he's put in this position, the pod, the protective custody pod, essentially is supposed to prevent any inmates from gaining access to one another. And to answer Judge Kovas' question, as it relates to the deliberate indifference standard, the reckless disregard for that known risk is what we're looking at. I understand that it's not actual intent, but it's above negligence and it's establishing that they know that there is this risk. A reasonable step is to simply wait until the attackers, in this case, are placed back in their cells before opening the second cell. And they both admitted that they instructed the attackers here to go back into their cells for inmate safety. It's odd though, isn't it, because these attackers were in there for their own protection. There was no indication that I recall in the record that they were a danger to anyone else. They were in isolation or special detention here because they were underage. And I recognize that as well, but I think going back to the main point of protection is to make sure you don't have a situation where any inmates can get access to one another. This may not matter. Is there anything in the record about what motivated this? I mean, it's not related to the prior attack. Maybe it's just one of these things that happens in prison. There's unfortunately no evidence to suggest what the motivation was by these attackers. But I think the ultimate basis for the substantial risk of harm comes from, as I mentioned before, band eventer. But it also comes from Patterson v. Kelly, which establishes that a substantial risk of prior inmate attacks, if it's well documented, long-standing, pervasive, or if it's expressly noted by the officials, that can rise to the level of the risk of harm. And I think we have that in this case because the officers acknowledged that they knew that having more than one door open at a time poses a risk. It's in place to ensure the inmate's safety. As far as the deliberate indifference, excuse me, to go back to the band eventers' factors, they recognize that the precedent looks at the attacker's history. And in this case, it would be the Mathias and Hedricks. Those were the two minors that were in protective custody at the same time. They look to see whether the attacker is a violent individual. I agree we don't have that here. They look to see whether the attackers had previously threatened or fought with the victim in this case. Again, we don't have that here. But what we do have is we have two scenarios, one in which, as I mentioned, Mr. Johnson had requested protection and he was granted. And that protection was requested because of a substantiated attack on him earlier that day. We have several cases that were cited by the other side relating to a request for protection, but that request was based on a general fear in general population. They analyzed the fear, they took it into consideration, and they ultimately determined that it was unfounded. Here we have a scenario where the fear and the threat against safety was presented to the institution and it was granted. So he was in a place where he should have been better protected. So we have the knowledge of his prior threats. We also have the fourth factor under Banneventer recognizes that inmates, either the threat, excuse me, the attacker or the victim had recently been in a protective custody status or a restricted status like administrative segregation. And again, we have that recognized by Holden. Protective custody is designed to provide higher supervision and higher security for these inmates. So what did the officers do wrong? So at the moment they were opening Mr. Johnson's cell door. When they opened that door, the two attackers, Matthias and Hedricks, were outside of their cell having rec time. They instructed these offenders, actually the sequence, as I understand it through testimony, is that they opened the cell door for Mr. Johnson. So now we've got two doors open. They instructed Matthias and Hedricks to return to their cells. However, waiting until they were secured in their cells, they allowed Mr. Johnson to come out of his cell. Thus the attack ensued. Had they just simply waited until Matthias and Hedricks had returned to their cells and then opened the door, we would have avoided this. It's a very reasonable step of waiting until those inmates were secured. So the error quite literally is violated the one-door policy. Correct. And recognizing that having that one-door policy ensures the safety of all inmates. And each of these officers testified that there's a process that they go. They wait and they order the inmates to lock up. They shut the door. They open a second door. The evidence suggests that neither of those things happened. They allowed Mr. Johnson's door open. They gave the instruction. If there wasn't a fear of risk of harm, the instruction to return to their cells would have been unnecessary. And so it's appellant's position that the court erred in granting qualified immunity by failing to establish a risk of harm. What's the case out there that we could say would put the officers on notice that if they violated, if they didn't comply with the one-door policy, then they would be subject to a damages claim under Section 1983? So I would suggest that the Balducci case that's cited in the brief, while I cite it for the official immunity, I would suggest that that presents notice that in that case the attacker, I recognize the attacker in that case had a violent history and was meant to be kept away from other inmates, but they had timed checks to ensure that these type of- Well, doesn't that exclude that case from being notice, constituting notice? I mean, it sounds to me like you need a case that says if you violate a jail rule on segregation of prisoners and a prisoner is attacked, then that's a violation of a constitutional right. I'll admit, Judge, that based on my review of case law, this is a new case in that specifically protective custody inmates were given access to one another in a fighting suit. Now, again, I recognize Holden. However, that case involved an attack by a cellmate, and presumably the cellmates are vetted whether they're on a known enemy list, and we don't have that in this case. We don't have the attack from a known enemy. Rather, we have a scenario where inmates are supposed to be separated from one another. They weren't separated from one another, and so this court gets to decide whether or not that protective status is important enough to deem a substantial risk of harm. If there's no questions additionally, I'd like to yield the rest of my time for rebuttal. Thank you, Mr. Cates. Thank you, Judge. Ms. Bates. Good morning. May it please the Court, my name is Rachel Bates, and I represent the defendant officers Jacob Sherman and Christopher Taylor. This case involves an unprovoked surprise attack by two inmates that occurred when plaintiff was placed in protective custody against a third inmate. This falls directly in line with the surprise attack clearly established law. I just want to deep dive a little bit into this one door open at a time rule. This is not a policy. There is no established policy with the Jefferson County Jail about one door open at a time. The district court was correct because it found that plaintiff's effort to present a policy for one door open at a time was not supported by any evidence on the record. The district court examined the officer's testimony and found it conclusory. It examined the inmate movement policy that was presented to the court and found that it did not provide this one door open at a time. What's the distinction between a rule and a policy in terms of analyzing the facts here? Well, I don't know that there is a huge distinction. It's just what is the source that's compelling these officers to act. What is the source? Because there was testimony. There was testimony, yes, but the testimony was best practice. Did you have specific training or on-the-job training that allowed you to have knowledge of this rule? The answer was, well, it's common practice. So it's an unwritten rule. It's unwritten. It's a best practice by the officers themselves. There was no testimony about a supervisory order telling them that they have to act in a certain way, that they are required or compelled to act in a certain way. But they admit, or I want to say broadly they admit it, but was there testimony in the record that one door at a time practice was for the purpose of protecting inmate security? Yes. And I don't think that's an issue. I think that it's, you know, the jail policies are, yeah, we want to protect our inmates. However, our officers are only able to do so to the extent of the knowledge that they have. And here, they didn't have knowledge of a specific threat. They acted in accordance with their common practice. But they didn't have knowledge that these attackers, who were actually placed into protective custody because they were minors, not because they had any violent tendencies or rule violations in their past, the officers had no knowledge that these individuals were going to attack this plaintiff. And the plaintiffs themselves testified that he had no knowledge who these individuals were and why they wanted to attack him. And I think that the law requires, you know, as far as imparting that knowledge upon our officers, the law requires more than just some, you know, isolated single incident to prove deliberate indifference and to show a substantial risk of harm. The violence must occur with frequency to apprise the prison officials of the existence of a problem and the need to take protective measures. And in this case, the officers were advised of the existence of a problem with this third party, this Haferkamp, who was the initial attacker. And that's who the plaintiff requested protective custody from. So the officers knew, hey, we have to keep this individual away from Haferkamp. We have to keep him safe from Haferkamp. They did not know that they had to keep him safe from these two individual attackers who had no history of violence tendencies. There's no other plaintiff has not identified, and there's no evidence of any other incidents at the jail where this risk of harm was so pervasive that the, you know, inmates were clinging to the bars by the guardrails that they needed protection. The record is completely lacking any evidence, and there is no evidence that this is a systemic problem in the jail. There's no history of attacks based on a violation of this proposed, purported one door open at a time rule. The record is completely absent of this, and there is no evidence of that. And I think that that's important because the officers have to be informed, and they have to have knowledge of this history of attacks. They have to know that there is a longstanding pervasive issue in the jail where if they open up one door open at a time, or more than one door at a time, then the inmates are going to come rushing out and attacking each other. And there's a complete lack of evidence of that. I think that in this context, the district court was completely correct and correctly concluded that the defendant officers were not deliberately indifferent, and there was no substantial risk of harm. There was no pervasive history showing a substantial risk of harm, but going to the mindset that were required for deliberate indifference, and I think that the court has already talked about this a little bit, but this is a highly culpable mindset that we're talking about. There's approaching actual intent to cause harm to the plaintiff. There's no evidence that these officers knew that if they opened this door, these two attackers were going to rush out the door and cause harm to the plaintiff. There's absolutely no evidence. There's no evidence of violence tendencies. So plaintiff cannot rely on any specific threat in this context because there was no specific threat. Now, there is case law about going to the Holden and Herner case. In that case, the plaintiff was housed in protective custody with three other detainees, and then he was involved in an altercation with his cellmates. I believe that the court examined exactly what evidence there was that there was any prior threats, and found that the plaintiff did not present any evidence that the prison officials had any knowledge of any prior attacks by these cellmates themselves. Rather, the court found that the Holden offered no evidence that the prison officials had any knowledge of any specific danger posed to Holden. I think that's important because when you look at these individuals who are in protective custody, yeah, the plaintiff was in protective custody, but these individuals were also in protective custody for minors. I don't believe that there is any greater duty to the plaintiff than to the minors who were in protective custody to keep them safe from each other. So there's no specific threat. There's nothing that's going to put our officers on notice that opening one door is going to wreak havoc in the jail and to cause them to be charged deliberately indifferent and to violate these individuals' constitutional rights. I think the record is completely lacking in that. If the court doesn't have any questions, I know I speak very fast and I have a lot of time, but thank you very much. Thank you, Ms. Bates. Mr. Cates, your rebuttal? Yes, Your Honors. Thank you. I would start by saying I think the defense, excuse me, the appellees sensationalize what they expect should happen should one of these doors or should two of these doors be opened at a time by referencing havoc and complete pandemonium taking place within the jails. They reference that there's no history of attacks within these. There's no facts to suggest that there's a history of attacks within the protective custody pod. Perhaps that's because the other officers are following through with this rule and not exposing other inmates to each other within the protective custody pod. I think it bears noting specifically relating to a surprise attack. This court in Patterson specifically stated that when the risk is so obvious or well-documented, the fact finder could conclude that the prison official is aware of it. And if that's the situation, then surprise attack precedent doesn't apply. And in this case, as I mentioned before, the officers knowing that opening multiple cell doors at a time poses a risk, they instructed the inmates as such to return to their cells after they opened Mr. Johnson's door. Thus, they recognized that there was, in fact, a risk of harm. They were deliberately indifferent to that risk by not waiting until they returned to their cells. I think the fact that they can acknowledge this potential negates the surprise attack precedent that the appellees tried to convince the court of. Counsel, what were Mr. Johnson's injuries? Fractured his spine and he had a laceration to his forehead. If there's no other questions, Your Honor, that's all I have on rebuttal. Thank you for your time. Court, thanks both counsel for participation and argument. We will continue to study the matter and render decision in due course. Thank you.